Kinkade, J.,
 

 concurring. I heartily concur in the opinion written by Judge Jones. This court is not passing in review on the Remus murder trial. No court ever had any authority to disturb the verdict returned by the jury in that case.
 

 During that very long trial, the state at no time believed that Remus was insane. The state was then contending that he was sane when he killed his wife, and so, of course, was insisting that he was sane as he was being tried for that crime. Had counsel for the state or the trial judge believed that Remus was insane, it would have been their duty to postpone-the trial until his sanity was restored. An insane man cannot be called to plead to an indictment which charges him with murder, or to stand trial for murder, or for any other crime while his insanity continues. There is nothing new about this proposition. It is well known to all lawyers and all judges of all courts. It would not be even respectful nonsense to say that the prosecuting attorney of Hamilton county and the trial court, with a jury, spent several weeks trying to convict a man of murder who was known or believed to be insane throughout the trial. So we have the self-evident fact that the trial court and able counsel for the state were fully convinced
 
 *177
 
 that during all that time they were trying a sane man, and not an insane man. Remus was under their immediate continuous observation every day in open court, and he was very active there in aiding his own attorneys in the preparation and presentation of his defense. How would it have been possible for any one to have had a better opportunity to judge of the mental condition of Remus — as to whether he was sane or insane — than was there afforded to the trial judge, the jurors, and the counsel for the state? Evidently it never occurred to any of them that Remus was then insane.
 

 The verdict of the jury in that case was, not that Remus was then insane, but was that he was insane at the time he shot his wife, some months before. The verdict spoke with reference to that date, and no other date; and, but for the statute which required that he should be taken before the probate court, so the judge of that court might determine upon evidence what his mental status with respect to sanity was on the date of the hearing in the probate court — which was done — the verdict of the jury would have set Remus free forthwith.
 

 The probate judge decided that Remus was insane on the date of the decision rendered by that judge, which was December 23, 1927, and pursuant to that decision Remus was transferred to, and confined in, the state hospital for criminal insane at Lima, until he should legally be discharged therefrom.
 

 .Before being taken from Cincinnati to the Lima hospital, counsel for Remus, on January 6,1928, instituted a proceeding.in error in the court of common pleas, challenging the correctness of the decision rendered by the probate judge.' That case, in the
 
 *178
 
 court of common pleas was never pressed for trial by either counsel for the state or counsel for Remus, and it stands on the. docket of the court of common pleas undisposed of. That case constituted no bar to the jurisdiction of the Court of Appeals in hearing the
 
 habeas corpus
 
 case some three months later.
 

 Insane asylums are built and maintained by the state for the care and treatment of the insane. They are not prisons in which punishment is inflicted on sane people by reason of crimes that they have com- ■ mitted. An asylum for the criminal insane is simply a method of separating the criminal insane class from the insane class who have no criminal propensities. It is still an asylum for the treatment and restraint of the insane, and is not a prison for the punishment of criminals who are not insane.
 

 To say there was no evidence produced in the Court of Appeals showing any change in the mental condition of Remus between the date on which the probate judge in Cincinnati found him to be insane, December 23; 1927, and the date, three months later, when the Court of Appeals found him sane beyond a reasonable doubt, impresses me as a statement of the question not entirely fair to the party involved. If we assume that the probate judge was correct, on the evidence submitted to him, in his finding that Remus was insane on that date, December 23, 1927, we must also assume that the judges of the Court of Appeals were correct in their finding, on the same question, on the evidence submitted to them, on the date of their decision three months later.' And, even though no witness came forward and said in so many words, if that be the fact, that the mental condition of Remus had improved in the three-months period
 
 *179
 
 between the two hearings, the conclusion would, of course, be inevitable that he must have improved in that period, .otherwise the Court of Appeals could not have found, as they did, that' the evidence produced before them established the sanity of Remus beyond a reasonable doubt.
 

 The proposition that the Legislature has clothed the superintendent of the asylum at Lima with the sole and exclusive right to determine when an insane patient under his care rshall have 'been restored to reason, and that, no matter how arbitrary or wrong his decision may be, it cannot be reviewed by a court, impresses me as wholly untenable. Counsel for the state, in argument in this court, said they were not contending that a gross abuse of discretion in this behalf on the part of the superintendent could not be reviewed and corrected by the courts. A majority of this court is quite unable to appreciate any sound reason why the Legislature would desire to clothe any individual with any such arbitrary power. It requires a decree of some court to establish the fact of insanity and to place any individual in an insane asylum. We are not aware of any tendency on the part of the Legislature to weaken or change this safeguard thus thrown around the individual citizen who becomes incapable of taking care of himself. When the light of reason 'comes again, who shall say that he may not appeal to the courts if and when it becomes necessary to secure his liberty. Is there any better use that can be made of the time-honored and sacred writ of
 
 habeas corpus
 
 than to then employ it in liberating a sane person from an insane asylum? If the person liberated belongs in prison, then he should be put in prison. He cannot
 
 *180
 
 be legally kept in an insane asylum merely because he cannot then be legally sent to some real prison, maintained for the punishment of criminals who are sane. To state that he can be is to state an absurdity that has no place in the law.
 

 It may be a very popular proceeding to keep Remus in the insane asylum, regardless of whether he is sane or insane; and it may be a very unpopular proceeding to turn him out, regardless of whether he is sane or insane; but surely no member of the Court of Appeals or of this court would consider any such feature of the case for a moment.
 

 •This court does not pass on the weight of the evidence in cases coming here for review from the Court of Appeals or the court of common pleas, no matter whether the case be criminal in character, or a civil action. This court does determine whether there is any evidence to sustain an issue in dispute, or whether the evidence produced to sustain a given issue is of that character and quality that justifies the trial court in reaching the conclusion it has reached. This principle has been many times announced here, and in no case is it better stated than in the criminal case of
 
 Breese
 
 v.
 
 State, 12
 
 Ohio St., 146, 80 Am. Dec., 340, the fourth clause of the syllabus of which is as follows:
 

 “A judgment will not be reversed because the verdict is contrary to the evidence, unless it is manifestly so, and the reviewing court will always hesitate to do so where the doubts of its propriety arise out of a conflict in oral testimony.”
 

 In the opinion of this court in the cited case, we find this statement, at page 156:
 

 “Lastly, it is said, that the verdict is contrary to
 
 *181
 
 the evidence, bnt before we can reverse a judgment for this reason, it must be
 
 clearly so.
 

 “The jury who try a cause and the court before which it is tried, have much better opportunities to determine the credibility and effect of the testimony, and we ought, therefore, to hesitate before disturbing a verdict, rendered by a jury and confirmed by a court, possessing such advantages, merely because there is an apparent conflict in the testimony. The conflict or its effect, might all disappear, if the witnesses were examined before us and we could see and hear them face to face, as they were seen and heard by the court and jury whose verdict and judgment are passing in review before us.”
 

 The sound and fundamental principles in this case have been approved and followed many times by this court. The rule is the same whether the questions of fact are submitted to a jury in the trial court or are submitted to the court itself where no jury is employed. It cannot be said by this court that the decision of the Court of Appeals is so manifestly against the evidence produced there as to justify this court in reversing the decision and judgment of the Court of Appeals. There are no complicated legal questions in this matter. The case is simple in the extreme, and calls only for the application of fundamentals, long established in the law, in order to rénder a correct decision of this case.